Filed 5/1/26

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION ONE

| | |
|---|---|
| ARTURO VELA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>HARBOR RAIL SERVICES OF CALIFORNIA, INC.,<br><br>    Defendant and Respondent. | B344723<br><br>(Los Angeles County<br>Super. Ct. No. 23STCV24281) |

_____

APPEAL from an order of the Superior Court of Los Angeles County, David S. Cunningham III, Judge.  Affirmed in part, dismissed in part, treated in part as a petition for writ of mandate and denied.

Justice Law Corporation, Douglas Han, Shunt Tatavos-Gharajeh and Talia Lux for Plaintiff and Appellant.

Fox Rothschild LLP and Steven Gallagher for Defendant and Respondent.

_____

## INTRODUCTION

The Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.)[1] exempts from its application "contracts of employment" of "railroad employees, or any other class of workers engaged in foreign or interstate commerce." (§ 1.) Plaintiff Arturo Vela, who worked for defendant Harbor Rail Services of California, Inc. (Harbor) as a railcar repairman, claims the trial court erred in compelling him to arbitrate claims relating to his employment because he falls within this exemption. Vela also claims that, because the FAA exempts him, the trial court erred in enforcing a waiver of class claims contained in his agreement to arbitrate. Under state law, Vela's waiver is potentially unenforceable. If federal law applies, it preempts such state law and the waiver is enforceable.

We find no error and affirm. The FAA applies to the parties' agreement to arbitrate and does not exempt Vela. Accordingly, the trial court did not err in compelling arbitration. Nor did the trial court err in striking the class claims, as Vela's waiver of those claims is enforceable under federal law.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Vela's Employment with Harbor

Harbor hired Vela as a rail freight car repairman on May 19, 2021, and terminated him on October 11, 2021. On May 10, 2021, prior to Vela beginning work, he and Harbor executed a mutual agreement to arbitrate. Under the agreement, the parties "agree[d] to the resolution by arbitration of all claims,

---

[1] All unspecified statutory references are to title 9 of the United States Code.

disputes, and/or controversies (collectively 'claims'), whether or not arising out of [Vela]'s employment or its termination, that [Harbor] may have against [Vela] or that [Vela] may have against [Harbor], its subsidiaries or affiliated entities, or against its employees or agents in their capacity."  The agreement also included a "[c]lass and [r]epresentative [a]ction [w]aiver" under which the parties "agree[d to] . . . forego pursuing any covered dispute on a class, collective, or representative basis and . . . not [to] assert class, collective, or representative action claims against the other in arbitration or otherwise," with an exception for "representative actions under the California Private Attorneys General Act or any class, collective, or representative claims that cannot be waived as a matter of law."

**B.    Vela's Lawsuit**

Vela sued Harbor on October 5, 2023, asserting causes of action under the Labor Code for unpaid overtime (*id.*, §§ 510, 1198), unpaid meal period premiums (*id.*, §§ 226.7, 512, subd. (a)), unpaid rest period premiums (*id.*, § 226.7), unpaid minimum wages (*id.*, §§ 1194, 1197), failure to timely pay final wages (*id.*, §§ 201, 202), noncompliant wage statements (*id.*, § 226, subd. (a)), and failure to reimburse business expenses (*id.*, §§ 2800, 2802), and a related claim under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.).  Vela asserted these claims on his own behalf and also on behalf of a would-be class of current and former Harbor employees.  Vela did not allege any representative claims under the Labor Code Private Attorneys General Act (Lab. Code, § 2698 et seq.).

3

## C. Harbor's Motion to Enforce the Arbitration Agreement

On March 6, 2024, Harbor filed a motion to compel Vela's individual claims to arbitration and to dismiss and strike his class claims. Harbor relied on the "[m]utual [a]greement to [a]rbitrate" which Vela had signed "in connection with his employment."

Harbor contended that the parties' arbitration agreement, including the class action waiver provision, was enforceable under the FAA. Thus, argued Harbor, the court was required to compel Vela's claims to arbitration and to dismiss and strike his class claims. Anticipating Vela's argument that the arbitration agreement fell within the FAA exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" (§ 1), Harbor asserted that Vela was not a "railroad employee[]" because Harbor was not a railroad company. Harbor further argued that Vela was not in a "class of workers engaged in foreign or interstate commerce" because "[his] work consisted of making repairs to trains that were decommissioned in [a railroad] yard, awaiting inspection and repairs," he did not inspect any locomotives or move, drive, or operate any trains or freight cars, and his work did not involve the "delivery of goods" or "transport[ation of] any goods across state or foreign lines."

In a declaration, Harbor's chief operations officer averred as follows. Harbor conducts "freight car inspections and repairs for a number of railroads." Harbor controls, manages, and oversees the work of its employees, who use Harbor's equipment to perform their work. During Vela's employment, Harbor "was under contract as an independent contractor for Pacific Harbor

4

Line ('PHL') to perform freight car inspections and repairs at PHL's train yard in Wilmington, California. Under [the] contract, . . . PHL's railroad customers, Burlington Northern Santa Fe ('BNSF['])￼ and Union Pacific ('UP'), would deliver their freight cars using their locomotives to the PHL train yard in Wilmington by stopping them on the interchange track in the yard, disconnecting their locomotives, and leaving the freight cars to sit on the track in the yard, awaiting inspection/repairs." At this point, the freight cars "were withdrawn from service/decommissioned . . . and . . . were not useable until and unless they passed inspection." Harbor "employees then would inspect the freight cars using quality control measures established by Federal Regulations . . . [and] would make [any] necessary repairs." The freight cars were then "released to PHL, and PHL eventually delivered them back to its railroad customers (BNSF or UP) with PHL's locomotive." "[Vela] was hired as and did work for Harbor as a [r]epairman at PHL. [Vela]'s work . . . consisted of performing inspection, repair and rebuilding of the decommissioned freight cars at the PHL train yard in accordance to [*sic*] all A[ssociation of] A[merican] R[ailroads] and F[ederal] R[ailroad] A[dministration] rules."

Vela does not dispute that the FAA (including any applicable exceptions to it) governs the parties' arbitration agreement. In opposing the motion to compel arbitration, Vela contended that the arbitration agreement was exempted from the FAA because he was a "railroad employee" and a "worker[] engaged in foreign or interstate commerce" under section 1. Vela submitted a declaration in which he averred that he worked for Harbor as a "[r]ailway [r]epairman" from May 2021 to October 2021; he was paid an hourly rate of $19; he repaired train cars

5

following Association of American Railroads and Federal Railroad Administration regulations and, more specifically, he "change[d] trains' wheels and brake pads, disassemble[d] and reassemble[d] train cars, and . . . weld[ed] and fabricate[d] metals for the ladders on the trains."

Vela argued that if the parties' arbitration agreement was exempted from the FAA, California law would apply in its place. Vela asserted that under California law his class action waiver was unenforceable under the test articulated in *Gentry v. Superior Court* (2007) 42 Cal.4th 443 and further that Labor Code section 229 exempted some of his claims from arbitration.

## D.    The Trial Court Continues the Hearing to Receive Further Evidence

In May 2024, the trial court issued a tentative ruling which indicated as follows. Harbor had demonstrated the existence of an agreement to arbitrate. The section 1 exemption for the specified "contracts of employment" did not apply because Vela had failed to show that the parties' arbitration agreement "should be interpreted as part of an employment contract as opposed to a standalone agreement." However, the hearing would be continued to provide Vela "a chance to supplement the record" on whether the arbitration agreement was part of a contract of employment.

The court also tentatively concluded that Vela was not a "railroad employee" within the meaning of the section 1 exemption because Harbor was not a railroad, and Vela could not rely on Harbor's contract with PHL. However, Vela had shown he was a transportation worker because Harbor's "business [wa]s substantially related to the railroad industry" and "[it] hired [Vela] to do inspections and mechanic work on [its] behalf for the

6

railroad clients." Vela's claim that the class action waiver was unenforceable under state law was "premature" and "w[ould] not be ripe unless and until the FAA-exemption issue [wa]s resolved, and only if it [wa]s resolved in [Vela]'s favor," and Vela's argument that the claims subject to Labor Code section 229 should be litigated was "also premature."

After hearing argument, the court modified the tentative ruling in one respect. Whereas the initial tentative ruling indicated Vela had shown he was a transportation worker, the revised tentative ruling stated, "On balance, . . . because this is a fairly novel issue, the [c]ourt is inclined to hold an evidentiary hearing with live testimony. This will help to create a clear picture of what, exactly, [Vela] did at work for [Harbor]."[2] The final tentative ruling continued the hearing for further evidence not only as to whether Vela had shown the arbitration agreement was part of a "contract of employment" but also as to whether Vela qualified as a transportation worker.

E. **The Parties' Supplemental Evidence and the Trial Court's Ruling Granting Harbor's Motion**

The parties submitted additional evidence on January 3, 2025. As relevant here, Vela submitted documents from his personnel file maintained by Harbor and an interrogatory response from Harbor indicating those documents, including the arbitration agreement, were "customary for new hires to sign upon initiating their employment with [Harbor]." Both parties

---

[2] Vela's contention that the court found his "burden . . . as to the transportation-worker issue" was "met" is meritless because it relies solely on the tentative ruling and ignores the trial court's later modification to that ruling.

submitted a copy of the "service agreement" (capitalization omitted) between Harbor and PHL.

In its supplemental brief, Harbor contended that Vela did not fall within the section 1 exemption because he had failed to show "a contract of employment required by [section 1]" and he "was not a transportation worker because he did not actively or directly move goods in interstate commerce as a repairman."

In his supplemental brief, Vela contended that he had established a "contract of employment" in part because he was "hired" by and worked for Harbor, and Harbor acknowledged in discovery responses that the arbitration agreement was executed in connection with Vela's employment. Vela also contended he was a " 'railroad employee[]' " because he "did railroad work." Vela did not address whether he was a "transportation worker."

On February 4, 2025, after hearing argument, the trial court granted Harbor's motion to compel Vela's claims to arbitration and to dismiss and strike his class claims. Vela timely appealed.

## DISCUSSION

### A. Appellate Jurisdiction

We generally lack jurisdiction to review an order compelling arbitration. (*Elijahjuan v. Superior Court* (2012) 210 Cal.App.4th 15, 19.) To establish appealability here, Vela invokes the " 'death knell' doctrine," which allows immediate appeals from "orders that effectively terminate class claims but permit individual claims to continue." (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 754.) The doctrine is premised on the concern "that an individual plaintiff may lack incentive to pursue his individual claims to judgment, thereby foreclosing any possible appellate review of class issues." (*Id.* at p. 758.) The

8

trial court's order dismissing and striking Vela's class claims "effectively terminate[d Vela's] class claims but permit[ted his] individual claims to continue" (*id.* at p. 754) and is thus appealable.

But that does not mean the trial court's order compelling arbitration is also appealable. (See *Nixon v. AmeriHome Mortgage Co., LLC* (2021) 67 Cal.App.5th 934, 943 [expressing doubts "whether the judicially created death knell exception to the one final judgment rule for an order dismissing class claims extends to make appealable an otherwise nonappealable order compelling arbitration when the two orders are issued simultaneously"].)[3] The *Nixon* court exercised its discretion to treat that portion of the appeal directed at the order compelling arbitration as a petition for writ of mandate and considered the merits of that order. (*Id.* at p. 944.) We take the same approach here, as the parties have fully briefed the issues and Harbor does not object to our addressing them. Review of the order compelling arbitration, which is based on the same grounds as the order dismissing and striking the class claims, will not cause any additional delay or subvert the purpose of the arbitration statute. (See *ibid.*)

---

[3] Vela asserts that we have jurisdiction to review the court's order compelling arbitration under *Franco v. Athens Disposal Co., Inc.* (2009) 171 Cal.App.4th 1277. *Franco* is distinguishable because the class action waiver in that case precluded class claims only in arbitration proceedings, and thus the trial court's order compelling arbitration effectively terminated the plaintiff's class claims. (*Id.* at pp. 1284, 1288.)

9

## B.    Standard of Review

In deciding a motion to compel arbitration, "the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)  A party opposing a motion to compel arbitration on the ground an exemption applies "bear[s] the burden to demonstrate that the exemption applies." (*Betancourt v. Transportation Brokerage Specialists, Inc.* (2021) 62 Cal.App.5th 552, 559.)

We review the trial court's factual findings for substantial evidence.  (*Muro v. Cornerstone Staffing Solutions, Inc.* (2018) 20 Cal.App.5th 784, 790.)  Under the substantial evidence standard, " 'we must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of credibility of the witnesses and the weight of the evidence.' " (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653.)  However, "the application of law to undisputed facts ordinarily presents a legal question that is reviewed de novo." (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912.)  We also review de novo a trial court order striking class allegations. (*Blakemore v. Superior Court* (2005) 129 Cal.App.4th 36, 53-54.)  The trial court's order "is presumed correct, and if it is correct on any theory, it must be affirmed regardless of the trial court's reasoning." (*Muro v. Cornerstone Staffing Solutions, Inc.*, *supra*, at p. 789.)

## C. The Trial Court Did Not Err in Compelling Vela's Individual Claims to Arbitration

As noted previously, Vela does not dispute the arbitration agreement here is governed by the FAA. Under the FAA, "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." (§ 2.) However, the FAA exempts from its reach "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (§ 1.) The last category, i.e., "any other class of workers engaged in foreign or interstate commerce," (*ibid*.) is limited to "transportation workers" engaged in foreign or interstate commerce. (*Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105, 109 [121 S.Ct. 1302, 149 L.Ed.2d 234].)

Vela contends that the section 1 exemption applies, so that enforceability of the parties' arbitration agreement is ultimately subject to California law instead of the FAA. If California law applies, then Labor Code section 229 would render the arbitration agreement unenforceable as to Vela's claims for unpaid wages. Conversely, if the arbitration agreement is ultimately subject to the FAA, then Labor Code section 229 would be preempted. (*Garrido v. Air Liquide Industrial U.S. LP* (2015) 241 Cal.App.4th 833, 844-845 ["The FAA preempts Lab[.] Code[, §] 229, requiring enforcement of an arbitration agreement"].)

11

The section 1 exemption applies if Vela is either a "railroad employee[]" or a transportation worker. As we explain, he is neither.[4]

1. *Vela is Not a Railroad Employee*

Vela does not claim that Harbor is a "railroad" or that he is a "railroad employee" by virtue of his employment by Harbor.[5] Instead, he contends he was a "railroad employee" because he provided train repair services to PHL under the contract between that entity and Harbor. Even if we assume a repair and inspection company like PHL is a "railroad," this theory fails because Vela did not have any contract with PHL and the contract between PHL and Harbor cannot constitute a "contract of employment" within the meaning of the section 1 exemption. (*Fli-Lo Falcon, LLC v. Amazon.com, Inc.* (9th Cir. 2024) 97 F.4th 1190, 1196-1197 ["for a contract to *be* a contract of employment covered by § 1, it must have a *qualifying worker* as one of the

---

[4] The parties also dispute whether Vela established that the parties' arbitration agreement was part of a "contract of employment." We need not address this issue because Vela's failure to establish he is either a "railroad employee" or transportation worker is dispositive.

[5] As the United States Supreme Court has explained, "When the FAA was adopted, . . . grievance procedures existed for railroad employees under federal law [citation] and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent [citation]. It is reasonable to assume that Congress excluded . . . 'railroad employees' from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers." (*Circuit City Stores, Inc. v. Adams, supra*, 532 U.S. at p. 121.)

parties"]; *Amos v. Amazon Logistics, Inc.* (4th Cir. 2023) 74 F.4th 591, 596 [agreement was not a "contract of employment" within the meaning of § 1 because it "d[id] not promise work and compensation to an individual employee, and it contain[ed] none of the hallmarks of a traditional employment contract, such as provisions regarding salary, benefits, and leave time," and "provide[d] instead for certain business services to be provided by one business to another"].)

*New Prime Inc. v. Oliveira* (2019) 586 U.S. 105 [139 S.Ct. 532, 202 L.Ed.2d 536], upon which Vela relies, is inapposite. In *New Prime,* the United States Supreme Court addressed whether "contracts of employment" as used in section 1 "refers only to contracts that reflect an employer-employee relationship" or "*also* encompasses contracts that require an independent contractor to perform work," and concluded that section 1 includes both types of relationships. (*New Prime Inc. v. Oliveira, supra,* at pp. 113, 116.) Thus, under *New Prime* Vela's agreement with Harbor could qualify as a "contract of employment" whether Vela was a traditional employee or an independent contractor, but nothing in *New Prime* supports the proposition that the contract between Harbor and PHL could be a "contract of employment" under section 1. Nor does *New Prime* support the proposition that Vela qualified as a "railroad employee."[6]

---

[6] The plaintiff in *New Prime* contended the section 1 exemption applied because he "qualifie[d] as a 'worker[] engaged in . . . interstate commerce,' " not because he was a "railroad employee." (*New Prime Inc. v. Oliveira, supra,* 586 U.S. at p. 113.) Although the high court suggested that the term " 'railroad employee[]' " could encompass an individual working

13

Vela also relies on the definition of an " 'employee' " of a " 'carrier,' " i.e., a railroad, used in the Railway Labor Act of 1926 (45 U.S.C. § 151 et seq.) which Congress enacted a year after the FAA. The Railway Labor Act of 1926 defined " 'employee' " to include "every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Surface Transportation Board." (45 U.S.C. § 151.) Even if we assume Congress intended this same definition of "railroad employee" to apply to another title elsewhere in the United States Code (namely section 1), Vela does not qualify as being "in the service of" PHL. It is undisputed he had no direct employment relationship with PHL and there is no evidence that PHL had or exercised any authority to supervise or direct his work. To the contrary, Harbor 's chief operations officer declared that Harbor "completely control[s], manage[s] . . . and oversee[s]" its employees. In addition, Harbor's agreement with PHL provided that Harbor was "an independent contractor with the sole right to supervise, manage, operate, control and direct the performance of its obligations under this [a]greement."

2. *Vela Was Not a Transportation Worker*

Courts employ a two-step framework to analyze whether an individual is a transportation worker exempt from the FAA under section 1. (*Southwest Airlines Co. v. Saxon* (2022) 596 U.S. 450, 455 [142 S.Ct. 1783, 213 L.Ed.2d 27] (*Saxon*).) The first step

_____

as an independent contractor for a railroad company (*id.* at pp. 120-121), Vela does not contend that he had any agreement with PHL, either as an employee or an independent contractor.

14

is to "defin[e] the relevant 'class of workers' to which [the individual] belongs." (*Ibid.*) This determination is based on "the actual work that the members of the class, as a whole, typically carry out." (*Id.* at p. 456.) The second step is to "determine whether that class of workers is 'engaged in foreign or interstate commerce.' " (*Id.* at p. 455.)

*Saxon* held that "any class of workers directly involved in transporting goods across state or international borders falls within [section] 1's exemption." (*Saxon, supra,* 596 U.S. at pp. 456, 457 [finding the "class of workers who physically load and unload cargo on and off airplanes on a frequent basis" to be such a class (fn. omitted)].) The answer is not "so plain" "when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders." (*Id.* at p. 457, fn. 2.) In such cases, to fit within the exemption, "[the] worker must at least play a direct and 'necessary role in the free flow of goods' across borders," or, "[p]ut another way, . . . must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." (*Id.* at p. 458.) "*Saxon*'s bottom line is that to qualify as a transportation worker, an employee's relationship to the movement of goods must be sufficiently close enough to conclude that his work plays a tangible and meaningful role in their *progress* through the channels of interstate commerce." (*Ortiz v. Randstad Inhouse Services, LLC* (9th Cir. 2024) 95 F.4th 1152, 1160, italics added.)

In *Lopez v. Aircraft Service International, Inc.* (9th Cir. 2024) 107 F.4th 1096, the Ninth Circuit held "that a fuel technician who places fuel in an airplane used for foreign and interstate commerce is a transportation worker engaged in

15

commerce because a fuel technician 'play[s] a direct and necessary role in the free flow of goods across borders.' " (*Id.* at p. 1101.) The court reasoned that refueling an airplane was "a vital component of its ability to engage in the interstate and foreign transportation of goods" and was thus " 'so closely related to interstate and foreign commerce as to be in practical effect part of it.' " (*Ibid.*)

We distill from *Saxon*, *Ortiz,* and *Lopez* that to be a transportation worker a person must play some role in the actual transportation of goods, and Vela has not adduced evidence of such involvement. Here, "the actual work" that workers in Vela's class "typically carr[ied] out" (*Saxon, supra*, 596 U.S. at p. 456) was inspecting and repairing rail freight cars which had been temporarily taken out of service and delivered to PHL's yard for the purpose of inspection. This type of work is too far removed from the actual process of transporting goods to "play a direct and 'necessary role in the free flow of goods' across borders" or constitute "active[] 'engage[ment] in transportation,' " so as to qualify Vela as an exempt transportation worker. (*Id.* at p. 458.) It was only after Vela and his coworkers completed their tasks that the freight cars were returned to actual service and again were actively engaged in transportation. (E.g., *Holley-Gallegly v. TA Operating, LLC* (C.D.Cal., Sept. 16, 2022, No. EDCV 22-593 JGB) 2022 WL 9959778 [truck mechanic who serviced trucks that hauled goods across state lines was not a transportation worker under *Saxon* because his connection to interstate commerce was too attenuated], vacated on other grounds in *Holley-Gallegly v. TA Operating, LLC* (9th Cir. 2023) 74 F.4th 997, 999.)

Vela relies on *Western Dairy Transport, LLC v. Vasquez* (Tex.App. 2014) 457 S.W.3d 458, where a Texas appellate court

16

held that an interstate trucking company mechanic qualified as a transportation worker under section 1. The court applied "a nonexclusive eight-part test"[7] (*Western Dairy Transport, LLC v. Vasquez, supra*, at p. 465) articulated by *Lenz v. Yellow Transp., Inc.* (8th Cir. 2005) 431 F.3d 348, 352, and concluded that the plaintiff mechanic was a transportation worker under section 1 because it found four of the factors "weigh[ed] heavily in favor" of that conclusion. (*Western Dairy Transport, LLC v. Vasquez*, at p. 466.) We do not find the court's analysis to be persuasive because it predates *Saxon*, and the four factors upon which it relied are no longer relevant under *Saxon*. The first factor, "whether the employee works in the transportation industry" is not relevant because *Saxon* directs that we focus instead on the "actual work" performed by the employee. (*Saxon, supra*, 596 U.S. at p. 456; see also *Bissonnette v. LePage Bakeries Park St., LLC* (2024) 601 U.S. 246, 256 [144 S.Ct. 905, 218 L.Ed.2d 204]

---

[7] The court described the eight factors to be considered as "(1) whether the employee works in the transportation industry; (2) whether the employee is directly responsible for transporting goods in interstate commerce; (3) whether the employee handles goods that travel interstate; (4) whether the employee supervises employees who are themselves transportation workers, such as truck drivers; (5) whether like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; (6) whether the vehicle itself is vital to the commercial enterprise of the employer; (7) whether a strike by the employee would disrupt interstate commerce; and (8) the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties." (*Western Dairy Transport, LLC v. Vasquez, supra*, 457 S.W.3d at pp. 465-466.)

["A transportation worker need not work in the transportation industry to fall within the exemption from the FAA provided by § 1 of the Act"].)  The other three factors, "which consider[ed] the importance of trucks and truck mechanics to [the employer's] overall business" (*Western Dairy Transport, LLC v. Vasquez*, *supra*, at p. 466) focus on the employer's business as opposed to the employee's actual work as required under *Saxon*.

Vela relies on other cases applying the section 1 exemption but they are all distinguishable because they involved workers who played some role in the actual transportation of goods. (*Betancourt v. Transportation Brokerage Specialists, Inc.*, *supra*, 62 Cal.App.5th at p. 554 [package delivery driver]; *Nieto v. Fresno Beverage Co., Inc.* (2019) 33 Cal.App.5th 274, 281 [delivery truck driver]; *Palcko v. Airborne Express, Inc.* (3d. Cir. 2004) 372 F.3d 588, 593 [employee who performed "direct supervision of package shipments"].)  Furthermore, Vela's contention that his case is similar to *Betancourt* and *Nieto* because "[his] rail car repairs were a 'phase' of a continuous movement of interstate goods to their destinations" lacks support in the record.  Although the contract between Harbor and PHL contemplated the possibility that some cars left for inspection might have goods in them, there is no evidence that this actually occurred or that Vela and his fellow class of workers ever, much less typically, inspected or repaired freight cars which were still carrying goods.

Lastly, Vela cites cases outside of the FAA context which he contends "held railroad repairmen are engaged in interstate commerce."  None of these cases involves a worker who repaired trains, much less one who repaired rail freight cars while they

were out of service. Furthermore, none of the cases applies the test articulated in *Saxon*.

**D.     The Trial Court Did Not Err in Dismissing and Striking Vela's Class Claims**

Because the FAA applies and Vela does not fall within the exemption set forth in section 1, the trial court did not err in dismissing and striking Vela's class claims. (See *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 359 [FAA preempts California law holding that class action waivers of the type at issue here are unenforceable].)

## DISPOSITION

The order dismissing and striking Vela's class claims is affirmed. The appeal of the order compelling arbitration is dismissed as a nonappealable order. Deeming that portion of the appeal as a petition for writ of mandate, the petition is denied. Harbor is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION


WEINGART, J.


We concur:



BENDIX, Acting P. J.          M. KIM, J.


19